We'll take the next matter on the calendar. And that is Selvaratnam v. Ashcroft. He appears to be a defendant in a lot of our cases, this fellow Ashcroft. Did you notice that? He's a busy man. What? The lawyer in this case wanted to get out by 11.15. Oh, okay. He said he, when we moved the case, he said he needed to get to... Okay. The last case. Yeah, okay. Go ahead. Your Honor, may it please the Court. As I see this case, it's distinguishable from Mahinder Singh, the airport statement case, only in that there's no question of him not having a proper translation to airport. All the other factors are there. There's no indication of how the interview was conducted, of how it was, how the transcript was prepared, of whether he had an opportunity to explain the things that were not stated in the airport statement, and, of course, his reluctance to speak, which he testified about extensively in his hearing. In this case, the government attorney and the immigration judge both placed great weight on the fact that he had three questions as to why he left his country. And all three answered... And I.J. made this adverse credibility finding. Yes. That's a hard thing to overcome. Well, it was based primarily on this airport statement and the fact that he didn't give all the details of his story at that time. Well... It wasn't... Aside from not giving details, there were a couple of questions that were arguably inconsistent with what he later said. And that's what really distinguishes this case from others for me, that it wasn't simply what he didn't say, but that he was asked whether he was ever arrested of any crime in any country, and he said no. He ought to have been confined to a jail or prison. He said no. And he later said arguably otherwise. So I think that's what you really need to address. Well, Your Honor, there were even greater inconsistencies with Mohinder Singh. He had an extensive history of problems, and he only told of one minor thing, and there were at least five other things. But did he, in saying I don't remember this, did he affirmatively say something inconsistent with what he said later, as opposed to not saying something? Well, the inconsistency as to arrest, he didn't have any criminal history. He wasn't ever charged with any crimes. And... Basically, you would argue that it wasn't inconsistent because you could say he wasn't. That the detentions in the camp that he testified to were arguably not arrests and arguably not in jail? Yes. Yes, I would argue that. He was never charged with anything. There was never an intention to charge him with anything. It was lamentably such a common practice in Sri Lanka of rounding these young men up. But that wasn't his later explanation. I mean, his later explanation was essentially he said this because he was handcuffed, which is a crazy way to interview somebody, and because he didn't want to implicate the government in so anything. And at one point he said he did say it, but he never said because I didn't understand the question to mean that. That's part of the problem. He's got all kinds of disparate reasons, even for that little thing. He's got all kinds of disparate reasons why he did or did not say it. He says it various times, but if you don't like this story, I've got another one for you. You know, like, well, I didn't mention it because I was afraid the INS authorities would beat me. Or I didn't mention it because I was afraid they'd send me back and I didn't want to insult the regime if they did. Or I did mention it, but they forgot to write it down. He's got all these different reasons. I told the lawyer's people about X. That was another problem, wasn't it? Why didn't you tell your lawyer?          I did. I did. I did. I did. I did. I did. I did. I did.  What else did he have with me? No other things? Well, he was confused about some things. I don't.  But the missing thing there was the bag of gasoline over his head. What's that? In Sri Lanka, when they take these men, they beat them and they do various things. The bag with gasoline. Yeah, and the fumes cause them intense pain and they pass out. It's another method of use. So he hadn't mentioned that in, of course, not at the airport, and he hadn't mentioned it in his declaration of the company design application. But we certainly have law that says that things you don't mention, details, are not necessarily good basis for lack of credibility if they're consistent with what you do say. So that's much less troublesome to me, and I think IJ had much less basis to stand on that. But what is troublesome is the set of events around the airline interview. Not so much what happened at it, but his then completely inconsistent set of explanations for why he said what he said. I didn't quite follow all of that. I'm sorry. What I was saying is that I think we have to go back to the airport interview and not only what he said there, but his explanations for what he said there and whether the IJ was not entitled to rely on that set of events as sufficiently impugning his credibility. Well, I don't perceive the immigration judge as relying on his attempts to explain the airport. The IJ just found that that was an insurmountable barrier, that he hadn't told his whole story as soon as he saw somebody in an American uniform. And I believe that reduces to the same problem as presented in Mohinder Singh and the Third Circuit cases, Balasubramaniam and Sancharaja. And the document doesn't have indicia of reliability. As the Court said in Mohinder Singh, it can't be substantial evidence because besides the translation problem, those other four factors. And the case mainly turns on the airport statement. And we strongly urge that it's not substantial evidence. The IJ also had other problems about calling his answers dancing around and exaggerating. That's, for instance, an excerpt directed to page 9495. The thing about exaggerating, for instance, was that all the Tamils in Colombo are being arrested. Well, that was in the context of being somebody new there. The other people in the house were not arrested because they had lived there for years. And he was probably the only young man in the house also. But the judge takes that and says, well, he's exaggerating. In the context of his answer and what he was thinking of, it's not an exaggeration at all. And the judge makes a lot of speculation about what conditions are, how somebody could accomplish something. And there's no there's no basis for speculation. Did he have a lawyer when he appeared before the IJ? Yes, he did. So there's there's a lot of dialogue between the IJ and the attorney about legal theories. What about this great dilemma he supposedly faced about having if he reported the army camp, the insurgents would get after him. And if he didn't, the army would get after him. But then he explains that he didn't have to report to the army camp, apparently, because his uncle had paid a bribe so he wouldn't have to. What do we do with that inconsistency? The point is, you know, we sort of pick apart. And an IJ is listening to this whole thing and saying, this is inconsistent. That's inconsistent. Something else is inconsistent. I just don't think I believe this guy. So I know we can pick each one of them apart and say, well, there's an explanation for each one. But anyway, what's the explanation for that? Well, that's a typical problem or dilemma for the Tamil men. If you look at the cases in the they all have that problem. And they also they get arrested. They get tortured for a few days or a few weeks and they get out by what's called bribes. I don't know that it's corruption. It may be the way the system is designed. So he he got excused from this sort of role that he was on. And that's no no more extraordinary than getting out by paying a bribe. I don't think there's an inconsistency there. Well, it's only inconsistent if he's excused from doing it. He can't he can't be under endangered by the surgeons for doing it because he doesn't have to do it. And he can't be in a problem with the army for not doing it because he doesn't have to do it. So that sounds inconsistent to me. I understand about the bribes. That's how people from many of these countries. You get yourself released by paying a bribe. I understand that. But the inconsistency is one of the reasons I'm so terrified is if I report I'm in trouble and I don't report I'm in trouble. But he didn't have to report. So. Well, that was in the first arrest, I believe. And then he was arrested again in June of 2001, shortly before he left the country. So at that time he was, you know, galvanized to do something. And he had to leave. Well, I think it's great that he's there for the interview. It's about the one that's in the record here, the warning that was given. And I think it's a standard. Mr. Tull, if you fear or have a concern about your move to the United States, you should tell me so. And then you will have the opportunity to speak privately and consistently to another officer about your fear and concern. And it seems quite a contradiction. I mean, you should tell me everything, but you don't really have to tell me anything, everything, because you can talk to somebody else. Yes. In fact, the immigration judge in his decision misread this and said that the officer told him it would be confidential. But there's no such statement in there at all. The officer told him when you talk to the other officer, it will be confidential. And I really don't think that the airport statements are designed to develop an asylum case. And the officers are not interested in that. And the way this one was done was exactly the same statement repeated three times. You know, you can't even infer that there's a chance for him to make three statements. It's impossible for it to be, you know, spoken and written down the same way three times. My time is up. There's no more questions. All right. Thank you. Good morning. May it please the Court. My name is Cindy Ferrier, and I'll be representing the government in this matter. This Court reviews credibility findings of the immigration judge and the Board of Immigration Appeals for substantial evidence. So that is, this Court must uphold the agency's determination unless evidence compels a contrary conclusion. The evidence does not compel a contrary conclusion in this case. Here, the immigration judge cited two internal inconsistencies in the petitioner's testimony. He cited two omissions in the various statements given to the INS, and in his asylum application, and in his testimony, which when compared all to each other, the omissions were significant. Singh and the cases on which it relies, the Third Circuit cases, seem to come pretty close to saying that these airline interviews are just worth nothing and should be ignored. How is this case different? And may I come back to that? Because I have two questions. So why was the IJA entitled to rely on the airline airport interview here? And two, if we left out the observations about the airport interview, what's left? I'm not sure that I heard your second question. My second question is, if we were to leave out the inconsistencies with the airport interviews, what's left with regards to substantial evidence of lack of credibility? Okay. First of all, this Court's decision in Singh did not establish a per se rule that airport statements may not be considered in assessing credibility. I think it stated — That hypothetical was, let's forget about the airport statement, and what else? Yeah. Look at what he said on other occasions. Right. Because I think at the airport, when he was at the airport, wasn't there a problem with the interpreters? In the Singh case, there was a problem with the interpreters and the translation. In this case, there was no such indication that there was any problem. He indicated during the airport statement that he, in fact, understood the questions that were being asked of him and that he understood the interpreter. He made clear during the — How many interpreters were there? Just one. It was a Tennille interpreter. But the bigger thing in this case is that he made clear in his testimony before the immigration judge that he did, in fact, understand the questions and the interpreter. And there was no — he never denied making any statements. Let's forget about the airport. Okay. Let's go to the other. Okay. And so if we don't have the airport statement — I do think that in this case it is distinguishable from Singh because there wasn't a problem with translation, firstly, but — and there were some other reasons, but that's the main one. Even — and I also think that here the immigration judge made it very clear that he wasn't, in fact, only relying on the airport statement. It was the first thing that he mentioned. Well, can't you just answer the question? Forget about the airport — what happened at the airport. That was — Yes. Yeah. I'm sorry. I was merely trying to get to Judge Berzon's first question, what I had understood it to be. Go to the second one, please. The second question. Moving on. Moving on. Go to the second one. The immigration judge also noted that there was omission — that the discrepancies from the credible fear interview and in the asylum affidavit that he attached, in both of those instances he had the assistance of counsel. So he could have — he should have been properly informed of the necessity to include all descriptions and to develop fully his case. And then when we get to his testimony, which further elaborates — The credibility interview doesn't have — the credible fear interview, there's just an extremely similar little report. So there's nothing there, right? The credible fear interview was very brief, but it doesn't have — there's not much listed there. He does mention that he was beaten and arrested, but he doesn't go into any detail. But it doesn't appear — I mean, it appears from the briefness of the report that the — I mean, there's four lines in which you could write, so it's not really that this was intended to be a report in which there was any great detail given. That seems to be lengthier, actually. Well, it's just another factor, I think, that the IAJ looked at. He didn't spend much time on that. But moving on — and also I'd point out that it was at the credible fear interview I was — where the petitioner was told that he could speak in private, that none of the information would be passed on to his government, that he could feel free to describe any sort of treatment that he received or anything at the — any problems with the Sri Lankan government in that. But moving on to his testimony, then — or his asylum affidavit and his testimony, that's where there are many discrepancies and omissions. In his asylum affidavit, he does not mention — he mentions the two beatings. He goes into great detail about the second beating and mentions the torture incurred therein, but he doesn't do it with regard to the first beating. He also doesn't — he also there fails to admit or mention the fact that there was a bribe paid and that that was how he was released. He doesn't mention that? I thought he did mention that. In his asylum affidavit, I don't believe that. My uncle paid some money to the Army and I was released on June 27, 2001. I'm sorry. I didn't understand. My uncle — I'm reading. My uncle paid some money to the Army and I was released on June 27, 2001. Well, the fact that then he wasn't required to report again after that for his signing, which he later cited to as reasons for a part of his fear, as was mentioned earlier by Judge Bernardo, that he said that he was very scared that he would either have to report to the Army and that the Army would be mad or that the Tigers would be mad that he had to report. So the inconsistency, the fear from that should no longer be present once he paid the bribes. And then the other thing is once he actually does go on to describe the treatment that he received, in his testimony there is inconsistencies even there. The immigration judge cited that he was asked whether he had been asked any questions during his detention and the petitioner says that he had not been and then immediately says, yes, he had been asked questions. There's other inconsistencies that further support the adverse credibility of determination. One would be that he said that he was in a very, very small room when he was held for his second detention and yet he later stated that he thought four or five people had beaten him in that room and then later said that he thought he heard over a hundred voices in that room while he was being beaten and then later clarified that he thought it was two or three people. He also stated about that second beating that he had been unconscious for the beating, but then he later said pretty closely thereafter that he was actually conscious and he knew that because there was a sharp pain in his stomach. So it's these inconsistencies and as they're set forth in much greater detail in our brief that support the immigration judge's determination in this case. Are there any further questions about Singh? Did I deal with that enough? Well, the problem, of course, with your dealing with Singh is that if the only problem in Singh was the translation, then it should have stopped after the translation issue, but it did not. It went on to say that in addition to linguistic difficulties, there are other factors and all the other factors do apparently apply here, do they not? The other factors, I mean, we have ways that we can distinguish them as we set forth in our brief, which was that in Singh he was only asked 17 questions. He wasn't given an opportunity supposedly to detail his asylum claim. In this case, the petitioner was asked 45 questions, and one of the questions in particular said detail all the reasons that you left Sri Lanka. In addition, I think that another big distinguishing factor, as you mentioned earlier, Judge Berzon, is the fact that in Singh the alien did not, wasn't an entirely inconsistent statement. Rather, he was building on the airport statement, mentioned only, you know, his arrest, I believe it was, but later his testimony went on to finish, to give more detail as to that. In this instance, as pointed out, the petitioner actually denied ever being arrested or confined in Sri Lanka, and then later entirely recounted that to then give all this information, further information about beatings and his detentions. So just in conclusion, the deference that this was- Well, as Singh said, he did not expose himself. I'm not, I wasn't arrested because I was taken to this camp, but that's not arrested, and I was not in prison, I was in a camp. Right. But he does later say that he had, it seems clearer later from his affidavit, that he understood what an arrest and a confinement was. I think you're probably right. Excuse me? Okay, fine. Just in conclusion, although the court may determine or could possibly determine that there would be, that the record supports an alternate conclusion- Let me ask you one more question. There is a sort of double bind in the way that he was informed during the airport interview about what this was about. He was told, if you have any fear or concern about being removed from the United States or being sent home, you should tell me so during this interview because you may not have another chance. You will have the opportunity to speak privately and confidentially to another officer about your fear or concern. So what is he being told? Is he being told, you need to tell me everything now, or if there are things that are embarrassing or disturbing or you don't want to tell me now, you'll have a chance to tell later. Well, I believe that, first and foremost, he's being told you need to tell the truth and tell me what your basis of your fear is, and we'll move from there. He, however, did not, based upon what he's saying later, he says he wasn't even telling the truth at that time because he didn't mention, he in fact denied ever being arrested or beaten. So I think- But he's sitting there in handcuffs, just having gotten off the airplane, and he could certainly think to himself, telling somebody I've been arrested is not going to be when these people have me in handcuffs during an interview. They're going to think I'm a bad guy, and they're going to send me right back. But they're telling me I'll be able to speak confidentially later on, so at that point is when I'll tell my story. Well, I think the immigration judge considers that, actually, and determined that, or noted that the petitioner had already accused the Sri Lankan government of that act, even in that airport. But that's a different question than have he been arrested. If somebody takes you off an airplane and puts you in handcuffs and treats you essentially as somebody who's being arrested, he might say to yourself, well, the one thing I don't want to tell them is that I've been arrested right now. I'll tell them later when I have a chance to talk to somebody confidentially. Well, there is the fact that he was aware that other people did come here to get asylum and were granted asylum. I guess he was aware that the United States is able to give people asylum. Therefore, based upon the instructions that he was given at the airport interview, he should have known that he could have elaborated and at least made out the very basis for his claim so that they would know to believe him and move on. Well, I suppose it's hard for us to put ourselves in someone else's shoes that comes from a place like Sri Lanka. If you read the paper today, they had, you know, big riots. They called out the army. And, you know, there have been, what, hundreds of thousands of people killed in that island that used to be called something else. I forget.  Ceylon. Yeah, Ceylon. That's where we get all our tea and a lot of our tea. So, you know, it's a different culture. And they're used to dealing in this particular way with people in authority. And, you know, they want to survive. And there's a certain amount of mistrust. So it's a tough deal all the way around. Okay, thanks. You're welcome. All right, we're going to, this matter is submitted.
judges: Pregerson, Fernandez, Berzon